Daniel Cohen, AZ Bar # 032552
CONSUMER ATTORNEYS, PLLC
68-29 Main Street
Flushing, NY 11367
Telephone: (718) 770-7901
Fax: (718) 715-1750
E: dcohen@consumerattorneys.com

Emanuel Kataev, Esq.
*Pro Hac Vice Motion Forthcoming*
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Plaintiff*
*Celida Ponce*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Celida Ponce, <br><br> Plaintiff, <br><br> v. <br><br> Maricopa Consolidated Domestic Water Improvement District, <br><br> Defendant. | **Case No.:** <br><br> **COMPLAINT WITH** <br> **DEMAND FOR JURY TRIAL** |

Plaintiff Celida Ponce ("Ponce" or "Plaintiff"), by and through her attorneys, Consumer Attorneys PLLC, upon personal knowledge as to herself and upon information and belief as to other matters, respectfully brings this Complaint against Defendants Maricopa Consolidated Domestic Water Improvement District ("Defendant" or the "District") and alleges as follows:

**INTRODUCTION**

1.      Plaintiff brings this lawsuit against Defendant for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e, *et seq.*), the Age Discrimination in Employment Act ("ADEA") (29 U.S.C. §§ 621–634), the Arizona Civil Rights Act ("ACRA") (A.R.S. §§ 41-1401 to 41-1493.04), the Federal Labor Standards Act ("FLSA") (29 U.S.C. § 201, *et seq.*), the Fourteenth Amendment of the United States Constitution ("14th Amendment") (enforceable through 42 U.S.C. § 1983), the Arizona Employment Protection Act ("AEPA") (A.R.S. § 23-1501), the Arizona Public Employee Whistleblower Law ("APEWL") (A.R.S. §§ 38-531 to 38-534), and Arizona common law.

2.      Upon information and belief, Defendant discriminated against Plaintiff by reason of her age.

3.      Plaintiff has therefore commenced this action to seek damages for discrimination, plus interest (pre-judgment and post-judgment), liquidated damages, attorneys' fees, and costs.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343 because the Title VII claims present a federal question.

5.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise under a common nucleus of operative facts.

6. Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, i.e., Plaintiff performed the work for Defendant in Maricopa, Arizona.

**PARTIES**

7. Plaintiff is an adult individual who is citizen of the State of Arizona residing in Pinal County.

8. Plaintiff was employed by the Defendant in the State of Arizona since in or about approximately February 2022.

9. Defendant is a municipal entity organized under the laws of Arizona with a primary office located at 45290 West Garvey Avenue, Maricopa, AZ 85139.

10. At all times relevant, Defendant employed Plaintiff to perform work on behalf of Defendant within the State of Arizona.

**PROCEDURAL BACKGROUND**

11. Plaintiff exhausted her administrative remedies at the United States Equal Employment Opportunity Commission (the "EEOC").

12. The EEOC issued Plaintiff a Notice of Right to Sue (the "Notice"), which Plaintiff received on August 5, 2025. A true and correct copy of the Notice is attached as **Exhibit A**.

13. This Complaint is being filed within ninety (90) days of Plaintiff's receipt of the Notice and is therefore timely.

- 3 -

**STATEMENT OF FACTS**

14.     Based upon the information preliminarily available, and subject to discovery in this cause, Defendant discriminated against the Plaintiff on the basis of her age and gender, and was retaliated against for making good faith complaints about discrimination in the workplace.

15.     Plaintiff has been employed by the Defendant as an Office Assistant since on or about February 17, 2022.

16.     At the time Plaintiff was hired by Defendant, a new manager, by the name of Gloria Landa-Estrada ("Gloria"), commenced employment with the Defendant.

17.     From the beginning, Gloria treated Plaintiff poorly and visibly detested her for no apparent reason (at least, initially, as Plaintiff was unaware why Gloria disliked her).

18.     On or around February 13, 2024, Plaintiff, together with her co-employee, Jocelyn, began to notice that Gloria, and their field manager, Matt Willford ("Matt") were engaged in a romantic relationship with each other.

19.     As a result of this relationship, Plaintiff felt a shift in the workplace due to Gloria's and Matt's inappropriate relationship, given that both of them were married.

20.     For example, Plaintiff often observed displays of affection between Gloria and Matt which she found inappropriate.

21.     Furthermore, Plaintiff noticed that Gloria treated Matt than Plaintiff better in the terms and conditions of employment.

- 4 -

22. For example, Gloria frequently took Matt with her to board meetings (which Plaintiff previously attended), while Plaintiff was left in the office with double the work to do.

23. Notwithstanding, Plaintiff did her best to ignore this behavior by her superiors and did so by focusing on her own job performance.

24. On March 23, 2024, Plaintiff was informed by a customer of an unapplied cash payment to his account.

25. Plaintiff sought to verify that the cash payment was made by accessing the video of the office which was available through the Ring application, an electronic doorbell device that records activity in the office.

26. The videos from the Ring device are accessible from the District's work cellular device, which is the property of the Defendant.

27. Upon opening the District's work phone to access the video available through the Ring application, Plaintiff came across videos of Gloria and Matt hugging and kissing each other in the workplace on work time.

28. Plaintiff also observed Gloria gossiping and spreading false and humiliating information about Plaintiff to Matt.

29. Plaintiff therefore reached out to Chris Giles ("Giles"), the board chairman, to request a meeting and discuss concerns that she believed in good faith required board attention.

30. Specifically, Plaintiff believed in good faith that it: (i) was inappropriate for Matt and Gloria to engage in an affair or amorous activities while on company time; (ii)

- 5 -

created a conflict of interest for Matt and Gloria to fraternize with each other and that doing so violated the Defendant's policies concerning same; and (iii) was essential to address Gloria's false statements about Plaintiff to vindicate her reputation and ensure her job security.

31. Plaintiff and Giles met at MOD Pizza for lunch on Saturday, March 24, 2025.

32. During that meeting, Plaintiff discussed the office conflicts and expressed her desire to maintain a healthy and welcoming office environment.

33. During their meeting, Plaintiff forwarded the few videos in her cellphone to Giles, to provide evidence of her concerns regarding the work environment.

34. Giles reassured Plaintiff that using the cellphone to review videos for safety reasons was appropriate and encouraged her to proceed if necessary.

35. On Monday, March 26, 2025, Plaintiff, upon arriving at the workplace around 7:00 AM, was approached by Gloria and Matt, in an aggressive and confrontational manner.

36. Gloria and Matt directed Plaintiff to put down her belongings and join them to the patio to discuss an allegedly important matter.

37. Despite feeling fearful due to the threatening atmosphere created by Gloria's demeanor, Plaintiff nonetheless followed Gloria and Matt to the patio to hear what they had to say.

38. When they arrived at the patio, Gloria engaged in cold and searing unbroken eye-contact with the Plaintiff and – with intense rage – shouted words to the effect of "*I'm done with this b****; she has just ruined my marriage*" followed by other derogatory words.

39.    Gloria then pointed her finger at the Plaintiff, saying words to the effect of "*Do you have any idea what you just did? Do you have any idea what you just caused? You f****** b****, you just ruined my marriage. You are breaking up our marriages. It's none of your business that we are having an affair. Are you that f****** stupid?*"

40.    Gloria's behavior became increasingly violent as she got closer to Plaintiff's face and continued yelling: "*Look at you, look at you, **look how old you are**" and began calling Plaintiff derogatory names, shouting "Señora, p**** señora estas **vieja** (**old** lady you are old) look at the way you look? You f****** **old** a**! You are jealous of me! Estúpida C***** (stupid a******), Que te valga madre pendeja , estupida; You are jealous because I am with Matt? Answer me you b****, do you like him?*"

41.    During this discriminatory tirade, Plaintiff demanded that Gloria stop calling her derogatory names and cease her verbal abuse.

42.    Plaintiff emphasized that she was not responsible for Gloria's affair with Matt, and that her primary concern was Gloria's act of spreading lies about Plaintiff in the workplace as captured in that video (which incidentally captured the affair between Gloria and Matt as well).

43.    Plaintiff became aware during this tirade, however, the true reason Gloria detested her – because she was an older woman in the workplace.

44.    Gloria kept yelling to the Plaintiff insisting "*Look at me in the face and tell me you will erase the videos. You stupid b****, this is going to be hell for you! Come on, are you scared of me?*"

45.    Matt then intervened, holding Gloria back during this intense confrontation.

46.     Despite being held by Matt, Gloria continued to try to physically attack the Plaintiff, swearing at her in Spanish, "*P\*\*\*\* p\*\*\*\* estúpida, ¿qué te importa, i\*\*\*\*? Señora, mírate, señora, me tienes celos, mírate p\*\*\*\* **vieja** señora, te voy a arruinar tu vida, p\*\*\*\*\*!*" (*"F\*\*\*\*\* stupid b\*\*\*\*, what's it to you, idiot? Ma'am, look at you, ma'am, you're jealous of me, look at you, f\*\*\*\*\* **old** lady, I'm going to ruin your life, you d\*\*\*\*\*\*"*) and saying that "*I am going to destroy you, Celi!*"

47.     As soon as Plaintiff saw Gloria and Matt move away from the door, Plaintiff attempted to leave the patio, but Gloria and Matt continued to block the exit.

48.     Matt had to restrain Gloria because she was attempting to physically attack Plaintiff.

49.     The situation escalated, and at one point, Gloria came very close and swung at the Plaintiff.

50.     At the time, Plaintiff was holding a clipboard. Gloria struck Plaintiff's left arm, which caused the clipboard to hit Plaintiff's face.

51.     As a result of the impact, Plaintiff's sunglasses fell off on the patio floor and broke.

52.     Plaintiff told Gloria and Matt words to the effect of "*there's no way you can blame me for your wrongdoing. You both are at fault. How dare you blame me for your affair? This is on you two. You made the poor decision to have your affair at the workplace and in front of cameras. This is disrespectful to others with your unusual behavior*."

53.     Thereafter, Plaintiff managed to reach the door and grab her belongings.

54.     Matt followed Plaintiff to the lobby.

55.     Gloria continued yelling and shouting aggressively, telling other co-workers Jocelyn and Perry "*don't trust this b\*\*\*\*; she is a weird stupid a\*\* that worries about what others do! She just ruined my marriage, and Matt's marriage for being f\*\*\*\*\* nosy. Do not trust this stupid b\*\*\*\*, she has ruined us. She is the worst and I'm about to destroy her as she has just destroyed our marriages. She has no idea who she just f\*\*\*\* with!*"

56.     Jocelyn, the office clerk, approached Gloria and said, "*Please stop, calm down. You need to sit down and talk this over. I'm sure there's a misunderstanding.*"

57.     Despite Jocelyn's intervention, Gloria continued her threatening behavior, shaking her fist angrily.

58.     Perry, a field crew co-worker, simply put his head down.

59.     On March 26, 2025, Plaintiff returned to the workplace and an onslaught of retaliatory conduct commenced against her.

60.     Upon arrival, Matt approached Plaintiff and invited her to the kitchen, because he and Gloria wanted to speak with her, whereupon she saw Gloria seated at the conference table.

61.     Gloria told Plaintiff "*I want you to know that I will be documenting that you left yesterday without permission and notice, which constitutes 'job abandonment.' Just understand that I have every right to terminate you for this conduct. In any other job, you would be terminated for this behavior.*" And then she asked Plaintiff "*Do you understand?*"

62.     Plaintiff responded to Gloria with words to the effect of "*Did you really expect me to continue standing there yesterday and allow you to verbally abuse me and harass me*

*for the rest of the day? There was no way I was going to let you two treat me like that, especially after you said this would stay behind us...*"

63.    Matt interjected, suggesting, "*We all just need to calm down and leave this behind us. There are many people involved here that we don't need to hurt, including our families.*"

64.    However, Gloria stood up from her chair and once again engaged in a tirade, screaming derogatory names at Plaintiff.

65.    Gloria's behavior became increasingly violent, just like the day before on the back patio.

66.    She yelled, "*Stop playing the victim, you b****! I'm going to destroy you.*" She continued to threaten Plaintiff, stating, "*Once again, I'm going to document all of this. I'll write you up for leaving the premises yesterday. You can't do whatever you want. I'm your manager, and you need to follow my rules! From now on, you need to communicate every time you leave for lunch or anywhere outside the office.*"

67.    Prior to her complaint, Plaintiff was never required to inform Gloria or any supervisor about when she had to leave for lunch.

68.    Plaintiff responded by telling Gloria words to the effect of "*You need to stop this right now. I won't tolerate another second of this. Today, both of you need to understand that I will not be a target of mistreatment. I expect to be treated with the same respect you expect from me. Unfortunately, we don't have an HR department to support me, but I will not tolerate this behavior without reporting it to someone else.*"

- 10 -

69.    After Plaintiff addressed their behavior and asserted her expectations for respectful communication from them, both Gloria and Matt gathered their belongings and left the room.

70.    After two days of conflict, Plaintiff continued to show up to work.

71.    As the days progressed, the workplace atmosphere seemed to improve slightly.

72.    Plaintiff maintained her professional boundaries, but found it extremely challenging to engage in conversations with Gloria and Matt.

73.    Nonetheless, Plaintiff upheld a consistently professional attitude, ensuring only to engage in work-related discussions and respectful communication.

74.    Most of Plaintiff's communications were conducted via email and text using her personal cell phone, as the office cell phone was kept exclusively by Gloria.

75.    Previously, the office cell phone was available to all employees of Defendant.

76.    As days went by, the communication between Plaintiff and Gloria became more fraught; for example, when Plaintiff would reach out to Gloria via text, Gloria would take longer than usual to reply, if she replied at all.

77.    Plaintiff's proposed ideas and suggestions related to their work were also ignored, leading to stagnation and a backlog in day-to-day work.

78.     This situation created a problem, which concerned Plaintiff, as she did not want to be blamed for the backlog, which was reflected by unentered data in QuickBooks and numerous other projects awaiting her cross-training and assistance.

79.    Plaintiff decided to reach out again to the board chairman, Giles, to bring her concerns to his attention, hoping he would address the underlying causes of the unsupportive management.

80.    Plaintiff was eager to seek help to navigate and resolve disagreements respectfully.

81.    Her goal was to find a solution to stop the daily sense of threat and the fear of losing her job due to conflicts with the office manager.

82.    Plaintiff wanted to suggest that they urgently needed staff meetings and improved communication, as the disengagement was severely impacting morale, causing retention problems, and creating stress within the workforce.

83.    After multiple attempts to secure a meeting with Giles, Plaintiff finally received confirmation by phone on April 30, 2024 that they would meet on May 1, 2024 at 3:00 PM at the Headquarters Restaurant nearby.

84.    However, on May 1, 2024 at 10:31 AM, Plaintiff received a text message from Giles abruptly canceling their meeting.

85.    Plaintiff, upon returning from lunch on the same day, was surprised to find Giles in the office.

86.    Upon arrival, Giles walked over to Plaintiff's desk, greeted her, and said words to the effect of "*Hey, how's it going? Sorry about canceling on you today. I'm actually here to meet with Gloria and Matt. They have something to discuss with me.*"

87.    Plaintiff replied with words to the effect of "*Oh, OK, no problem. Just don't forget to reschedule with me whenever you get a minute.*"

- 12 -

88. Plaintiff observed that the meeting between and among Giles, Gloria, and Matt was quite lengthy.

89. After it concluded, Giles left without saying goodbye to anyone.

90. Immediately afterward, Gloria announced that she was leaving for the day without any further communication.

91. On May 6, 2024, Plaintiff arrived at work at 7:30 AM.

92. Both Gloria and Matt were in the kitchen with the door open as Plaintiff proceeded to her desk.

93. A few minutes later, Jocelyn arrived and as soon as she sat at her desk, Gloria came over and said, "*Hey Jocelyn, oh good, you are here. Good to see you. We will be back. Please call me if anything. We are stepping out to check sites.*"

94. At about 9:00 AM, Gloria returned to the office and immediately came to Plaintiff's desk with Matt, accusing her of spreading rumors about their affair.

95. They claimed that Giles had met with them on May 1, 2024 and informed them that Plaintiff had discussed their affair with him.

96. During this discussion, Plaintiff immediately called Giles in front of Gloria and Matt.

97. Giles answered the call, and Plaintiff immediately explained that Gloria and Matt were confronting her over a matter that she never discussed with Giles again.

98. Giles simply replied "*What are you talking about?*" confirming that Plaintiff never had any subsequent discussion with Giles about Gloria's and Matt's affair.

99.    Because Giles had been unresponsive to her requests for a meeting, during lunch, Plaintiff tried to reach out to Lucy Hernandez ("Lucy"), the board vice chair, and Chad Molyneaux, the secretary/treasurer board member.

100.    During her conversation with Lucy, Plaintiff emphasized the urgency of getting a hold of her and Giles for a meeting regarding the aggression Plaintiff was experiencing from Gloria and Matt in retaliation for her complaint.

101.    Given Plaintiff's knowledge that Lucy and Gloria were friends, Plaintiff explained that she was not trying to cause any issues or create problems with Gloria.

102.    Lucy responded to Plaintiff in a very angry tone, saying that Plaintiff needs to stop gossiping and spreading rumors that she is in a hostile work environment.

103.    Lucy also told Plaintiff that if she has a problem, she needs to report it to Gloria, who is next up in the chain of command.

104.    However, because Gloria was the individual Plaintiff had complaints about, it was inappropriate for Lucy to require Plaintiff to speak to Gloria about her complaints.

105.    In doing so, Lucy made Gloria the judge, the jury, and the executioner of any complaints concerning Gloria.

106.    On May 6, 2024, Plaintiff received a text message from Gloria, stating, "*Continuing to reach out to Board members without consulting me about your concerns continues to not be acceptable. This will also be documented.*"

107.    Since enduring persistent conflicts with management, Plaintiff's emotional state had become chaotic and severely stressed.

108. At that time, Plaintiff was experiencing shortness of breath, a crushing sensation in her chest—symptoms resembling a severe panic attack.

109. Plaintiff felt compelled to call her doctor and schedule an appointment as soon as possible.

110. Plaintiff secured the earliest available appointment the next day on May 7, 2024.

111. Plaintiff texted Gloria to provide updates on the entire day, since Gloria and Matt had taken the rest of the day off following the morning incident.

112. In her message to Gloria, Plaintiff sent an end-of-day report, and informed Gloria that she would be in at her regular time on May 7, 2024, and mentioned her scheduled doctor's appointment at 9:30 AM on said date.

113. On May 7, 2024, Plaintiff stepped out of the office for a doctor's appointment from 9:15 AM to 12:30 PM.

114. On that same day, Plaintiff began encountering an issue where she was denied access to their shared files and QuickBooks.

115. These resources contained essential billing templates and information necessary for Plaintiff to complete her tasks.

116. Plaintiff promptly informed Gloria of the problem via text.

117. Gloria responded by first instructing Jocelyn to log into her computer with a new password but later clarified that Plaintiff was not authorized to access it.

118. Due to the deliberate denial of access to the computer system, Plaintiff was unable to complete the tasks assigned to her.

- 15 -

119. On May 31, 2024, Plaintiff was scheduled to arrive at work at 12:00 noon.

120. On May 31, 2024, Gloria left on Plaintiff's desk a copy of Defendant's Handbook with a Post-It Note instructing her to sign and date the Acknowledgment of Review and Receipt.

121. However, Plaintiff refused to sign the Acknowledgment of Review and Receipt until she fully understood its contents.

122. Upon perusing the revised Handbook, Plaintiff noticed that it lacked approval by the District Board Members.

123. Plaintiff informed Gloria of her intention to read the Handbook before signing. Gloria responded "*What is it that you have to understand? Just sign it. Haven't you ever read an employee manual before?*"

124. After Plaintiff continued requesting more time to review the documents, Gloria became very irritated, displaying dominating body language.

125. Matt, who was next to Gloria, said, "*Why do you have to make things so hard? We all employees have to sign it as soon as possible, it's mandatory. It's a handbook, and she is our manager requiring you to sign the top page and date it. We all need to sign.*"

126. Gloria and Matt then packed up their things and left the office without communicating whether they would return.

127. Shortly after they returned to the office, Plaintiff observed that Gloria and Matt were accompanied by a lady with black hair, who was wearing nurse attire, specifically scrubs.

128. After completing her tasks, Plaintiff prepared to leave the office.

- 16 -

129. At that moment, Plaintiff observed Gloria, Matt, and a visitor—whom she believed to be Gloria's sister—on the patio.

130. Plaintiff approached the patio, opened the door, and noticed Gloria's body language became hostile.

131. The visitor gave Plaintiff a very disapproving look.

132. Nevertheless, Plaintiff addressed Gloria professionally, saying, "*OK, Gloria, I'm heading out. I've completed the billing, and I will drop off these statements before going home. Have a good weekend.*"

133. As Plaintiff was preparing to leave the parking lot, her daughter FaceTimed her, and Plaintiff was showing her around with her phone, indicating that she was leaving the office.

134. While on FaceTime, Plaintiff noticed through her rearview mirror that Gloria and Matt were approaching her car aggressively.

135. Suddenly, Plaintiff heard Gloria shout, "*What are you doing? What the hell are you doing taking pictures of my sister's car?*"

136. Plaintiff replied, "*What are you talking about? I'm on the phone with my daughter. Nobody is taking pictures of your sister's car. How would I even know that was your sister? Do you have any evidence of me taking pictures?*"

137. However, Gloria continued to shout, telling Plaintiff to "*Go home!*" repeatedly.

138. After leaving the premises, Plaintiff stopped and texted Gloria to address the situation.

139. The text message clearly requested that Gloria stop accusing Plaintiff of doing things that were untrue.

140. Following that message, Plaintiff took the time to provide Gloria with an update on everything that occurred at work that day.

141. Gloria replied that "*Account 1308 is still under investigation*", referring to an issue where account number 1308 had been billed incorrectly.

142. When the engineer discovered the error, Gloria again placed a false accusation on Plaintiff, claiming that the mistake was due to intentional actions on Plaintiff's part.

143. Specifically, Gloria said that she would investigate why Account 1308 was billed with incorrect rates and meter readings, and suggested that someone might have altered the multiplier in February 2024.

144. On June 4, 2024, Plaintiff arrived at the workplace and upon attempting to unlock the front door with her key, was surprised to find it opened from the inside by Gloria.

145. Plaintiff was informed by Gloria that, effective immediately, Plaintiff was terminated from her position.

146. Plaintiff handed Gloria her keys and asked if she could retrieve personal items, specifically her daughter's pictures, from her workspace.

147. Gloria responded by telling Plaintiff "*For security reasons, you are not able to come in. Please don't make this an issue. The police were on standby for this situation, but they had to leave. Please take your letter, and we will send your belongings*."

148. Soon after, Plaintiff received a text message from Gloria that Plaintiff's personal room divider and other personal belongings would be delivered by Perry and be left at her front door.

149. However, when the Plaintiff's belongings were delivered, many of the items were broken, or otherwise missing.

150. The box did not have any indication or label stating that it was fragile.

151. As a result, three of Plaintiff's four coffee mugs were broken.

152. Three pictures of Plaintiff's daughters were missing.

153. Many of Plaintiff's personal pens that she had bought with her own money were not in the box.

154. Similarly, Plaintiff's plastic cubby, purchased by herself and not reimbursed by the company, was never returned.

155. Additionally, a decorative plant given to Plaintiff by her daughters for her birthday was missing.

156. On June 27, 2024, Plaintiff asked her daughters to go to the district office to pay the water bill, given that they were customers of Defendant.

157. For precaution and safety reasons, Plaintiff asked one of their friends to accompany them.

158. Plaintiff instructed them to record the entire process to ensure that they conducted themselves respectfully, and that they did not engage in any negative interactions.

159. Plaintiff's daughters followed these instructions and peacefully completed the payment process.

160. Upon their arrival at the MCDWID office, Plaintiff's daughters noticed Gloria's vehicle and prepared themselves for a quick and peaceful transaction.

161. They proceeded to make the payment with Jocelyn, the office clerk, and then left the premises.

162. As they were backing out of the parking lot, Plaintiff's daughter, Monique Ponce, who was driving, noticed Gloria, Matt, and another young man walking out of the office at a fast pace towards Gloria's car.

163. As Plaintiff's daughters were leaving, they observed Gloria making gestures and raising her hands in an aggressive manner, indicating for them to come back.

164. Plaintiff's daughters noticed her aggressive demeanor, and Plaintiff's youngest daughter saw Gloria raise her middle finger at them.

165. Gloria engaged in the foregoing ageist conduct toward Plaintiff from the beginning until the end of her employment.

166. Soon after Plaintiff's termination, Gloria was also terminated by Defendant.

167. Following Gloria's termination, it is public record that Gloria destroyed Defendant's office.

168. From the commencement of her employment, Plaintiff has consistently demonstrated a high level of professionalism.

169. Plaintiff's contributions have been instrumental in maintaining the quality and reputation of the Defendant's operations.

- 20 -

170.    Plaintiff has been recognized by both management and colleagues for her strong work ethic, attention to detail, and ability to effectively manage staff and her duties in a high-pressure environment.

171.    Further, as a testament to her qualifications, Plaintiff never received any negative feedback related to her performance during her employment with the Defendant.

172.    Plaintiff's termination following her protected activity—reporting discrimination—raises the ugly specter of a retaliatory discharge and failure to accommodate under applicable laws.

173.    Plaintiff was treated differently by Gloria compared to her co-employees because of her age and was held to a higher standard than her counterparts.

174.    To add insult to injury, Plaintiff was not properly paid overtime compensation for work she was suffered and permitted to perform during her tenure with the Defendant.

175.    Throughout her time with Defendant, Plaintiff was subjected to text messages and phone calls from Gloria, sent to Plaintiff's personal cell phone, before and after her regular working hours, for which she was never compensated.

176.    As a result of these violations of labor laws, Plaintiff seeks compensatory damages and liquidated damages in an amount to be determined at trial.

177.    Plaintiff also seeks interest, attorney's fees, costs, and all other legal and equitable remedies this Court deems appropriate.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE ADEA
### (DISCRIMINATION AND RETALIATION ON THE BASIS OF AGE)

178. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

179. Plaintiff is a member of a protected class on the basis of her age.

180. Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendant's legitimate business expectations.

181. Defendant discriminated against Plaintiff as described above by treating her differently relative to her co-employees.

182. Defendant also retaliated against Plaintiff as described above, when Plaintiff, after reporting unprofessional behavior of her co-employees, was unlawfully terminated.

183. Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights under the ADEA.

184. Defendant, by its actions and omissions, discriminated against Plaintiff on the basis of age in violation of the ADEA.

185. Defendant's violation of the ADEA was willful, entitling Plaintiff to liquidated damages under 29 U.S.C. § 626(b).

186. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

**COUNT II**
**VIOLATION OF THE TITLE VII**
**(DISCRIMINATION AND RETALIATION ON THE BASIS OF SEX/GENDER)**

187.    Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

188.    Plaintiff timely filed a Charge of Discrimination with the EEOC and received a Notice of Right to Sue.

189.    Plaintiff is a member of a protected class on the basis of sex. She is a woman.

190.    Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendant's legitimate business expectations.

191.    Defendant discriminated against Plaintiff, as described above, including but not limited to subjecting her to a hostile work environment and wrongfully firing her, because of her sex.

192.    The aforementioned events reflect not only a clear violation of company policy and professional conduct standards, but also constitute unlawful discrimination and harassment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964.

193.    Defendant also retaliated against Plaintiff when she engaged in protected activity, including complaints of this discrimination and unequal treatment in the workplace.

194.    Defendant's failure to take any remedial action following Plaintiff's complaints further demonstrates a reckless disregard for Plaintiff's rights and a pattern of discriminatory and retaliatory conduct.

195. Further, the circumstances surrounding Plaintiff's termination — including that it was executed by Gloria, her primary discriminator, and the person whom she had complained about — further demonstrate a clear pretext for retaliation.

196. Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights under Title VII of the Civil Rights Act.

197. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

**COUNT III**
**VIOLATION OF THE FLSA**
**(UNPAID OVERTIME)**

198. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

199. By failing to pay overtime wages as required by 29 U.S.C. § 207, Defendant violated the FLSA.

200. Plaintiff is entitled to recover unpaid overtime compensation, liquidated damages, attorney's fees, and costs pursuant to 29 U.S.C. § 216(b).

**COUNT IV**
**VIOLATION OF THE ACRA**
**(DISCRIMINATION AND RETALIATION ON THE BASIS OF AGE)**

201. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

202. Defendant is an employer as defined under the Arizona Civil Rights Act, A.R.S. § 41-1461, *et seq.*

203. Defendant discriminated against Plaintiff with respect to compensation, terms, conditions, and privileges of employment because of Plaintiff's protected status.

204. Defendant retaliated against Plaintiff by terminating her in direct response to her good faith complaint about discriminatory conduct in the workplace.

205. Defendant's conduct was intentional, willful, and/or taken in reckless disregard of Plaintiff's rights under the ACRA.

206. As a result of Defendant's deliberate and willful violation of the ACRA, Plaintiff is entitled to reinstatement to her former position or its equivalent, back pay, front pay, lost employment benefits, damages and attorney's fees and costs pursuant to A.R.S. § 41-1481(J).

207. Plaintiff timely filed a Charge of Discrimination with the EEOC, which was automatically cross-filed with the Arizona Civil Rights Division pursuant to their work-sharing agreement, thereby satisfying all administrative prerequisites under Title VII and the ACRA.

**COUNT V**
**VIOLATION OF THE ACRA**
**(DISCRIMINATION AND RETALIATION ON THE BASIS OF SEX)**

208. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

209. Plaintiff is a member of a protected class on the basis of sex. She is a woman.

210. Defendant is an employer as defined under the Arizona Civil Rights Act, A.R.S. § 41-1461, *et seq.*

211. Plaintiff is a member of a protected class on the basis of sex. She is a woman.

- 25 -

212. Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendant's legitimate business expectations.

213. Defendant discriminated against Plaintiff, as described above, including but not limited to subjecting her to a hostile work environment and wrongfully firing her, because of her sex.

214. Plaintiff engaged in protected activity under the ACRA by complaining to Defendant about sex discrimination and unequal treatment in the workplace.

215. Defendant retaliated against Plaintiff for engaging in protected activity, including terminating her employment.

216. Defendant's actions were taken in willful and reckless disregard of Plaintiff's rights under the ACRA.

217. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered lost wages, emotional distress, humiliation, and other consequential damages.

218. Plaintiff timely filed a Charge of Discrimination with the EEOC, which was automatically cross-filed with the Arizona Civil Rights Division pursuant to their work-sharing agreement, thereby satisfying all administrative prerequisites under Title VII and the ACRA.

**COUNT VI**
**VIOLATION OF 42 U.S.C. § 1983 AND THE 14th AMENDMENT**
**(PROCEDURAL DUE PROCESS)**

219. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

220. At all times relevant, Plaintiff was employed by Defendant.

221.    Defendant is a political subdivision of the State of Arizona and a "person" within the meaning of 42 U.S.C. §1983.

222.    Plaintiff possessed a constitutionally protected property interest in continued employment free from discrimination, harassment, and/or retaliation under applicable law, policies, and/or contractual provisions.

223.    Plaintiff was deprived of her employment by termination on or about June 4, 2024, which constituted a deprivation of her protected property interest.

224.    Plaintiff was not provided constitutionally adequate procedural safeguards prior to her termination, including:

      a.  Notice of the specific charges or reasons for termination;

      b.  A meaningful opportunity to respond to those charges before an impartial decisionmaker;

      c.  A post-deprivation hearing sufficient to contest the termination.

225.    The actions of Defendants were taken under color of state law and deprived Plaintiff of her rights under the Fourteenth Amendment to the United States Constitution.

226.    The deprivation of Plaintiff's due process rights was the direct and proximate result of the District's official policies, customs, or practices, including but not limited to:

      a.  A policy, custom, or practice of disregarding the due process rights of employees prior to termination; and/or

      b.  The deliberate indifference of final policymakers in failing to provide adequate procedures, training, and safeguards for disciplinary actions.

- 27 -

227.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered lost wages, loss of benefits, reputational harm, emotional distress, and other damages in an amount to be determined at trial.

**COUNT VII**
**VIOLATION OF 42 U.S.C. § 1983 AND THE 14TH AMENDMENT**
**(SUBSTANTIVE DUE PROCESS)**

228.   Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

229.   Defendant is a political subdivision of the State of Arizona and a "person" within the meaning of 42 U.S.C. §1983.

230.   At all times relevant, Plaintiff was employed by Defendant and worked under the authority and supervision of its managers and agents, who were acting under color of state law.

231.   While acting under color of state law and within the scope of their employment, Defendant's supervisors and/or employees subjected Plaintiff to escalating hostility, threats, and violent or abusive conduct.

232.   Plaintiff repeatedly attempted to report this misconduct to Defendant management and governing officials, but Defendant failed and refused to take corrective action.

233.   Defendant, through its policymakers, ratified, condoned, or demonstrated deliberate indifference to the violent and abusive treatment to which Plaintiff was subjected.

234.   The conduct described herein was so egregious, outrageous, and abusive as to shock the conscience and deprived Plaintiff of her substantive due process rights under

the Fourteenth Amendment to the United States Constitution, including her right to bodily integrity and to be free from arbitrary and abusive exercise of government power.

235. The constitutional violations suffered by Plaintiff were the direct and proximate result of the District's official policies, customs, or practices, including but not limited to:

    a. A custom or practice of tolerating workplace violence, retaliation, and abusive conduct by supervisors;

    b. Failure to properly investigate and remedy employee complaints of violence and abuse; and

    c. Failure to adequately train and supervise District managers with deliberate indifference to the constitutional rights of employees, including Plaintiff.

236. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered physical and emotional harm, loss of wages and benefits, damage to her professional reputation, humiliation, and other compensable injuries in an amount to be determined at trial.

## COUNT VIII
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (<u>MONELL</u> LIABILITY)

237. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

238. At all times relevant, Defendant was a political subdivision of the State of Arizona and a "person" within the meaning of 42 U.S.C. §1983.

- 29 -

239. At all times relevant, Plaintiff was employed by Defendant and was entitled to the protections of the United States Constitution, including the First and Fourteenth Amendments.

240. Plaintiff engaged in protected activity by reporting misconduct, abuse of authority, and unlawful or unsafe practices by her supervisor(s) and other Defendant employees to upper management and governing officials.

241. Following Plaintiff's reports, Defendant subjected Plaintiff to escalating hostility, harassment, and violence, culminating in her termination.

242. The constitutional violations Plaintiff suffered were the direct result of the Defendant's official policies, customs, and practices, including but not limited to:

    a. A policy, custom, or practice of ignoring employee complaints of misconduct and retaliation;

    b. A policy, custom, or practice of tolerating hostile, violent, or retaliatory conduct by supervisors against employees who raise concerns;

    c. Ratification of retaliatory and abusive conduct by final policymakers, including the Defendant's Board of Directors and Board Chairman, who failed to investigate, discipline, or correct known misconduct; and

    d. Failure to properly train, supervise, and discipline supervisors and managers with deliberate indifference to the constitutional rights of Defendant employees, including Plaintiff.

243. As a direct and proximate result of Defendant's policies, customs, and deliberate indifference, Plaintiff was deprived of rights secured by the Constitution, including:

      a. Her Fourteenth Amendment right to procedural due process in connection with her termination; and

      b. Her Fourteenth Amendment right to substantive due process and bodily integrity.

244. Defendant's policies and customs were the moving force behind the constitutional violations Plaintiff suffered.

245. As a direct and proximate result of the foregoing, Plaintiff has suffered lost wages, loss of career opportunities, reputational harm, emotional distress, pain and suffering, and other damages to be proven at trial.

## COUNT IX
## VIOLATION OF 42 U.S.C. § 1983 AND THE 14TH AMENDMENT
## (EQUAL PROTECTION)

246. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

247. At all relevant times, Defendant acted under color of state law.

248. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees all persons the right to be free from unlawful discrimination on the basis of sex.

249. Plaintiff is a woman and is a member of a protected class.

- 31 -

250. Defendant, by and through its agents and employees, intentionally discriminated against Plaintiff on the basis of sex, including subjecting her to disparate treatment, a hostile work environment, and termination.

251. Defendant's conduct was motivated, at least in part, by Plaintiff's sex, and deprived Plaintiff of her right to equal protection of the laws.

252. As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, emotional distress, humiliation, and other damages.

253. Defendant's conduct was carried out with deliberate indifference to Plaintiff's constitutional rights, warranting the imposition of punitive damages to the extent allowed by law.

## COUNT X
## VIOLATION OF THE AEPA
## (WRONGFUL TERMINATION)

254. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

255. At all relevant times, Plaintiff was employed by Defendant.

256. Plaintiff engaged in protected activity under A.R.S. § 23-1501 by reporting misconduct, abuse of authority, and/or violations of Arizona law and public policy by Defendant's supervisors and employees.

257. Plaintiff was subjected to retaliation, escalating hostility, and – ultimately – termination as a direct result of making such reports.

258. Defendant's termination of Plaintiff violated the Arizona Employment Protection Act, A.R.S. §23-1501, because Plaintiff was discharged in retaliation for:

- 32 -

a. Refusing to engage in conduct that would violate the Constitution or laws of Arizona; and/or

b. Disclosing to management practices reasonably believed to be in violation of the law.

259.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered loss of employment, lost wages and benefits, emotional distress, reputational damage, and other compensable injuries.

**COUNT XI**
**VIOLATION OF APEWL**
**(RETALIATION)**

260.    Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

261.    At all times relevant, Plaintiff was an employee of Defendant.

262.    Defendant is a political subdivision of the State of Arizona and therefore a "public employer" within the meaning of A.R.S. § 38-531.

263.    Plaintiff made disclosures to Defendant officials regarding mismanagement, abuse of authority, and/or violations of law, within the meaning of A.R.S. § 38-532(A).

264.    Following such disclosures, Plaintiff was subjected to retaliation in the form of harassment, hostility, and ultimately termination.

265.    Defendant's adverse actions were taken because of Plaintiff's protected disclosures, in violation of A.R.S. § 38-532.

- 33 -

Case 2:25-cv-04080-SMB    Document 1    Filed 10/30/25    Page 34 of 36

266. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered damages including lost wages and benefits, reputational harm, emotional distress, and other compensable losses.

### COUNT XII
### NEGLIGENT HIRING, RETENTION, AND SUPERVISION

267. Plaintiff re-alleges, and incorporates here by reference, all allegations contained in the paragraphs above.

268. At all times relevant, Defendant employed Gloria in a managerial and supervisory position.

269. During the course of Plaintiff's employment, Gloria engaged in hostile, abusive, and violent conduct toward Plaintiff, including assaultive behavior and knowingly spreading false accusations about Plaintiff.

270. Plaintiff made repeated reports of such misconduct to Defendant's upper management and governing officials.

271. Gloria's tumultuous behavior continued even after Plaintiff's termination, when she destroyed Defendant's office following her own termination.

272. Defendant knew, or in the exercise of reasonable care should have known, that Gloria was unfit, dangerous, or otherwise posed an unreasonable risk of harm to Plaintiff and other employees.

273. Despite such knowledge, Defendant negligently hired, retained, and/or supervised Gloria, and failed to take reasonable corrective or preventive action.

- 34 -

274.    Defendant's negligent hiring, retention, and supervision was a direct and proximate cause of Plaintiff's injuries, including physical and emotional harm, humiliation, reputational damage, loss of wages and benefits, and other compensable losses.

275.    Defendant is liable for Plaintiff's damages as a result of its negligence in the hiring, retention, and supervision of Gloria.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare that the practices complained of herein are unlawful under Title VII, the ADEA, the ACRA, 42 U.S.C. §1983, the FLSA, the AEPA, the APEWL, and Arizona common law.

B. Declare that the actions of the Defendant constituted unlawful discrimination, retaliation, and deprivation of Plaintiff's rights secured by the 14th Amendment to the United States Constitution;

C. Grant an injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

D. Determine the damages sustained by Plaintiff as a result of Defendant's violations of Title VII, the ADEA, the ACRA, 42 U.S.C. §1983, the FLSA, the AEPA, the APEWL, and Arizona common law, and award those damages against Defendant and in favor of Plaintiff, plus such pre-judgment and post-judgment interest as may be allowed by law;

E. Award Plaintiff an additional equal amount as liquidated damages because Defendant's violations were without a good faith basis;

F.  Award Plaintiff her reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees, pursuant to 42 U.S.C. §1988 and other applicable law; and

G.  Grant Plaintiff such other and further relief that the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all questions of fact raised by the complaint.

Respectfully submitted this 30th day of October, 2025.

By: /s/ Daniel Cohen
Daniel Cohen, AZ Bar # 032552
CONSUMER ATTORNEYS, PLLC
68-29 Main Street
Flushing, NY 11367
Telephone: (718) 770-7901
Fax: (718) 715-1750
E: dcohen@consumerattorneys.com

Emanuel Kataev, Esq.
*Pro Hac Vice Motion Forthcoming*
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Plaintiff*
*Celida Ponce*

- 36 -